IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DOUGLAS L. EASH** | : | **Civil No. 1:19-CV-141** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COUNTY OF YORK,** | : | |
| **PENNSYLVANIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | **Judge Sylvia H. Rambo** |

**M E M O R A N D U M**

Before the court is the motion for summary judgment filed by Defendant
County of York, Pennsylvania (the "County") and Individual Defendants Kristy
Bixler, Kimberly Rinker, and Ashli Stroud. (Doc. 37.) For the reasons set forth
below, the motion will be granted.

I.     **BACKGROUND**

This case arises from Plaintiff Douglas Eash's employment as an Operations
Supervisor with County's Department of Emergency Services ("911 Center"), where
he worked from 2005 to 2018. (Doc. 38 ¶¶ 1–2, 77.) On June 22, 2018, while he was
off the clock, Eash, a 54-year-old male, initiated a private chat via Facebook
Messenger with C.H., a 19-year-old female who had been recently hired by the 911
Center and was training to work as a dispatcher. (*Id.* ¶¶ 12–17; Doc. 40 ¶¶12–17.)
C.H. replied to the message, and the two struck up a conversation on Facebook
Messenger. After following up on a conversation they previously had in person at

1

work, the discussion turned to more personal topics. (Doc. 38 ¶ 18; Doc. 40 ¶ 18.) Eash told C.H. that he enjoyed engaging in BDSM—which Eash defined in his deposition as "bondage, discipline, sadism, and masochism"—and that he was in an "open relationship" with his girlfriend. (Doc. 38-1 at 113:11–14.) He also told C.H. that he lived an "alternative lifestyle," which included role playing scenes at the "dungeon," a designated BDSM environment. (Doc. 38-3 at 22, 28, 45.) C.H. told him that "[r]ough is the only way to do it;" that she uses "whips, chains, [and] bondage," and that she "like[s] being choked." (Doc. 38-3 at 22–23.)

Eash asked C.H. several times to send photos of herself, which she gave varying reasons for not sending. (*Id.* at 18, 39.) Without C.H.'s request and before she responded to his request for consent, Eash sent photographs of himself undergoing the stress-reduction treatment of "fire-cupping" in varying states of undress, including a photo in which he was fully naked and lying on his stomach. (*Id.* at 29–31; Doc. 38-6 at 3–5.) After sending the photos, Eash messaged, "Crap didn't mean to send." (Doc. 38-3 at 31.) At one point, he asked her if she wanted to meet up, and she did not respond. (*Id.* at 43–44.) Hours later, after resuming the conversation on a different topic, he followed up on his request to meet up, and she responded that she had bad reception and speculated his "girlfriend might get upset about that." (*Id.* at 44–45.) Over the course of the conversation, which lasted

approximately five days, C.H. asked him questions, volunteered information about herself, and did not voice any objection to Eash. (*See generally id.*)

C.H. subsequently sent a text message to a co-worker asking whether Eash had ever been "weird" with her and seeking advice on how to handle the situation. (Doc. 38-4 at 2.) In a subsequent message, C.H. walked back her concerns, telling her coworker that she might just be paranoid because of her childhood trauma, and that Eash is "actually really cool." (*Id.*). The co-worker forwarded the messages to Ashli Stroud, the County's East End Human Resources Representative, who later met with C.H. about the conversation. (Doc. 40-3 at 22:18–25:17; Doc. 40-2 at 10:20–11:5.).

On June 28, 2018, C.H. filed a written complaint with the County's human resources department regarding the messages from Eash. (Doc. 38-5 at 2.) The complaint states that Eash started talking to C.H. about "his sexual preferences and what he enjoyed doing to his girlfriend"; that C.H. "laughed it off" but that the messages made her "extremely uncomfortable"; and that C.H. did not want "to cause a big issue out of this" because Eash "was going to be a supervisor so I wasn't [supposed] to say anything." (*Id.*) C.H. also emailed Stroud three of Eash's fire-cupping photos, as well as screenshots showing some of the Facebook messages she received from Eash, including his message, "Just remember I'll eventually be your Supervisor. Nothing can be shared." (*See* Doc. 38-6 at 2–6.)

On June 29, 2018, toward the end of his work shift, Eash was called in to a meeting with Stroud and Kimberly Rinker, the County's Deputy Director of Human Resources. (Doc. 38-1 at 177:2–14, 184:11–14.) Stroud and Rinker told Eash about the allegations against him, asked him to turn over his phone, and told Eash that he could not leave the room until he showed them the conversation. (*Id.* at 180:5–7; 181:12–182:9.) Eash testified that at some point during the meeting, Rinker reached out and tried to grab his phone, and that he eventually decided to show them the text messages because he believed he would be terminated if he left the room without doing so. (*Id.* at 181:15–182:9, 196:11–197:15.) When Rinker and Stroud asked for his side of the story, Eash responded that he did not violate the 911 Center's sexual harassment policy because he was not C.H.'s supervisor. (*Id.* at 183:13–19; 184:18–185:1.) At the end of the meeting, Rinker and Stroud told Eash that he was being placed on paid leave until the investigation of the incident was complete. (*Id.* at 184:11–14; Doc. 40-3 at 8:16–2.) Rinker and Stroud also requested that Eash send them screenshots of the conversation before he left work, and Eash complied. (Doc. 38-1 at 69:3–16; Doc. 38-3.)

After reviewing the messages, Rinker and Stroud called Kristy Bixler, the County's Director of Human Resources, and provided a summary of their findings and jointly recommended that Eash be terminated. Bixler agreed with the recommendation and approved Eash's termination. (*See* Doc. 40-3 at 8:9–11:9,

28:12–17; Doc. 38 at ¶ 79.) On July 2, 2018, Rinker and Stroud, together with the assistant director of the 911 Center, met with Eash and notified him of his termination. (Doc. 40-3 at 75:2–7; Doc. 38-1 at 207:13–17.) Eash's termination letter, which was dated July 3, 2018 and signed by Rinker, stated that a human resources investigation concluded that Eash "engage[d] in inappropriate communication with an employee," and that he was "not truthful during the investigation." (Doc. 38-9 at 2.) The letter also alleged four infractions of the County disciplinary policy: "Disregard for policies, procedures and rules in performance of job duties;" "Theft or any form of dishonesty;" "Instigating dissatisfaction among fellow employees;" and "Sexual harassment." (*Id.*)

In January 2019, Eash initiated this action by filing a complaint, which he subsequently amended in April 2019. The amended complaint alleged claims for (1) civil rights deprivation of liberty interest under 42 U.S.C. § 1983 against the County; (2) violation of the Fourth Amendment under 42 U.S.C. § 1983 against all the Defendants; (3) intrusion upon seclusion invasion of privacy against the Individual Defendants; (4) defamation against the Individual Defendants; and (5) wrongful discharge in violation of public policy against all the Defendants.

Defendants thereafter moved to dismiss the complaint for failure to state a claim upon which relief may be granted, and the court dismissed with prejudice Eash's Fourth Amendment claim against Bixler, and dismissed without prejudice

Eash's defamation claim against Stroud and his intrusion upon seclusion claim against Bixler. (Doc. 16.) Eash subsequently filed the Second Amended Complaint adding a gender-based discrimination claim under the Pennsylvania Human Relations Act (PHRA) (Doc. 28), and Defendants answered. (Doc. 31.) Defendants now move for summary judgment (Doc. 37). The motion has been fully briefed and is ripe for review.

## II.   <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56(a) provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law and is "genuine" only if there is a sufficient evidentiary basis for a reasonable factfinder to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party" and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party

6

points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23. "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

## III.   <u>DISCUSSION</u>

### A. Defendants are entitled to summary judgment on Plaintiff's § 1983 claims.

Eash advances two claims under 42 U.S.C. § 1983, which provides citizens a civil cause of action for violations of their constitutional rights by persons acting

under color of law. Municipalities are only liable under § 1983 if the plaintiff identifies a municipal policy or custom and establishes that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). A municipality has a custom when its officials' practices are "so permanent and well settled" that they have the "force of law." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Municipal policy exists when a "'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985). In essence, for a municipality to be liable, "a direct causal link between the municipal action and the deprivation of federal rights" must exist. *Bd. of Cty. Comm'rs*, 520 U.S. at 404.

### 1. Deprivation of Liberty Interest in Reputation

The County argues that it is entitled to summary judgment on Eash's claim for violating his due process rights by depriving him of his liberty interest in his

reputation. "[T]o make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation *plus* deprivation of some additional right or interest." *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (citations omitted) (emphasis original). In the context of public employment, this "stigma-plus" test "has been applied to mean that when an employer 'creates and disseminates a false and defamatory impression about the employee in connection with his termination,' it deprives the employee of a protected liberty interest." *Id.* (quoting *Codd v. Velger*, 429 U.S. 624, 628 (1977)). "To satisfy the 'stigma' prong of the test, it must be alleged that the purportedly stigmatizing statement(s) (1) were made publicly, and (2) were false." *Hill*, 455 F.3d at 236 (citations omitted). The "plus" prong is met so long as the statements were made in the course of the public employee's termination. *Id.* at 238. The principal relief for a deprivation of liberty interest in reputation is a hearing to clear the plaintiff's name, which only serves a useful purpose if the discharged employee challenges "the substantial truth of the material in question." *Codd*, 429 U.S. at 627; *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000).

The Third Circuit has held that an employer's memorandum that accurately recounts the events leading up to an employee's dismissal and accurately states the regulations on which the discharge was based is not false and therefore cannot establish stigma. *Gilson v. Pa. State Police*, 676 F. App'x 130, 137 (3d Cir. 2017).

In *Gilson*, a Pennsylvania state trooper was terminated after an employment investigation validated a female crisis worker's complaint that the trooper had placed his arm around her waist and pulled her toward him, despite that the trooper's insistence that he had only touched her elbow. *Id.* at \*132–33. The Pennsylvania State Police sent a memorandum to the Pennsylvania Department of Labor and Industry that summarized the events leading up to the trooper's dismissal, identified the regulations the trooper was found to have violated (including "Discrimination or Harassment," "Sexual Impropriety"," and "Providing False Information"). *Id.* The Third Circuit found that the memorandum failed to support the plaintiff's claim that he suffered stigma because, to the extent its representations were stigmatizing, they were not false, and it accordingly affirmed the district court's grant of summary judgment to the Pennsylvania State Police on Plaintiff's deprivation of liberty interest claim.

Here, Eash's termination letter is insufficient to establish the stigma under the due process clause because, as in *Gilson*, its representations "accurately recount the events" that culminated in Eash's termination and adequately set forth the particular rules upon which the decision to terminate him was based. Eash's termination letter, which was sent to the director of the 911 Center and placed in Eash's personnel file, contends that he "engaged in inappropriate communication with an employee, you were also not truthful during the investigation. You violated the following County

of York Policy: EM 8.1 Employee Discipline Policy: . . . Theft or any form of dishonesty. . . Sexual Harassment." (Doc. 38-9; Doc. 40-3 at 14:3–7, 74:4–75:14.) The County's sexual harassment policy is "to comply with Federal and State law, specifically [Title VII] and the [PHRA] which prohibits employment discrimination" and sexual harassment. (Doc. 38-12 at 2.) The policy defines a hostile work environment, provides examples of verbal and nonverbal sexual harassment, and states that the perception of the victim is an important consideration in determining whether a violation occurred.[1] (*Id.* at 2–3.) Finally, the policy warns

---

[1] The sexual harassment policy prohibits a hostile work environment, described as:

> Hostile Work Environment—where the harassment creates an offensive and unpleasant working environment. A hostile work environment can be created by anyone in the work environment whether it be supervisors, other employees or customers. Examples of a hostile work environment include, but are not limited to:
>
> 1. Repeated actions, comments, or objects that unreasonably interfere with work performance or that create an intimidating, hostile or offensive environment.
>
> 2. Display of sexual pictures, calendars, graffiti or sexual objects.
>
> 3. Regular use of offensive language, jokes, gestures, or comments.

(Doc. 38-12 at 2, emphasis supplied.)

The policy lists the follow conduct as examples of sexual harassment.

> Sexual harassment can be physical, verbal or nonverbal.
> . . .
> 2. Examples of verbal sexual harassment include sexually oriented gestures, noises, remarks, jokes or comments; preferential treatment or promise of preferential treatment to an employee for submitting to sexual conduct, including soliciting or attempting to solicit any employee to engage in sexual activity for compensation or reward; and/or subjecting, or threats of subjecting, an employee to unwelcome sexual attention or conduct or intentionally making performance of the employee's

that the County may suspend or dismiss "employees who engage in sexual harassment or retaliation or who fail to cooperate with County-sponsored investigations of sexual harassment." (Doc. 38-12 at 5.)

The record contains significant evidence to support that Eash's conduct toward C.H. constituted sexual harassment under the law and the County policy. Title VII's prohibition of discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," encompasses sexual harassment. 42 U.S.C.A. § 2000e-2(1); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). To constitute sexual harassment, the conduct in question must be unwelcome. 29 C.F.R. § 1604.11(a). Conduct is deemed unwelcome if the recipient "neither solicited it nor invited it and regarded the conduct as undesirable or offensive." *Moore v. U.S. Virgin Islands Dep't of Tourism*, No. 2014-008, 2020 WL 5219533, *9 (D.V.I. Aug. 31, 2020) (citing *Meritor Sav. Bank, FSB*, 477 U.S. at 68). This determination is a generally

---

job more difficult because of that employee's sex, including that related to pregnancy, childbirth and childrearing.

3. Examples of nonverbal sexual harassment include but are not limited to staring at a person's body, leaning over someone, offensive gestures; offensive and/or sexually-suggestive electronic mail, displaying pictures, posters, calendars, graffiti, objects, promotional materials, reading materials, or other materials that are sexually suggestive, sexually demeaning or pornographic; and/or displaying signs or other materials purporting to segregate an employee by sex in any area of the workplace, other than restrooms and similar semiprivate lockers/changing rooms."

(*Id.* at 2, 3, 5.)

fact-intensive question based on the totality of the circumstances. *See e.g.,* 29 C.F.R. § 1604.11(b)*; Clegg v. Falcon Plastics, Inc.*, 174 F. App'x 18, 25 n.7 (3d Cir. 2006) (finding an issue of fact whether sexual advances were unwelcome where the recipient asked the alleged harasser to "talk dirty to her," purportedly as a joke). At the time of the incident, Eash was 54 years old and worked as a supervisor at the 911 Center. He initiated a private conversation with a 19-year-old female who was newly employed at the 911 Center, during which he shared details about his sexual preferences and alternative lifestyle, and made clear to her that he was in an open relationship. Eash sent C.H. unsolicited photos of himself partially unclothed. He repeatedly requested that C.H. send him photos of herself too, and he asked C.H. several times to meet with him. Eash's statement reminding C.H. of his role as a supervisor connected their sexual conversation and roles at work, in which Eash was expected to periodically supervise her upon her completion of her six-week training. (Doc. 38-6 at 6; Doc. 38 ¶ 4.) Although C.H. engaged with and contributed to the sexual content in the chat, she demurred from his requests for photos and repeatedly dodged Eash's requests to meet outside work. (Doc. 38-3 at 18–19, 38–40, 44–50.) C.H. additionally expressed her concerns to her coworker and filed a complaint with human resources. (Docs. 38-4, 38-5.) These facts substantially support that Eash's advances were unwelcome. Moreover, Eash's repeated requests for photos and to meet up appear to have "subject[ed] an employee to unwelcome sexual attention or

conduct" in violation of the County's policy (Doc. 38-12 at 3) (an example of verbal sexual harassment); Eash's messages, upon C.H.'s complaint, violated the County policy's prohibition of "offensive and/or sexually suggestive electronic mail" (*Id.*) (an example of non-verbal sexual harassment). Given the record evidence of Eash's sexually harassing behavior, there is no genuine issue of material as to whether he violated the sexual harassment policy.

Even if Eash did not sexually harass C.H., it remains substantially true that he violated the sexual harassment policy because he failed to fully cooperate with the sexual harassment investigation. (*See* Doc. 38-12 at 2) (County's sexual harassment policy stating that an employee can be terminated for failing to cooperate in a sexual harassment investigation); (Doc. 38-9 at 5) (finding that Eash was "not truthful during the investigation" and citing his dishonesty as a basis for his termination.) The undisputed evidence shows that Eash dishonestly denied the allegations against him, initially failed to disclose the contents of his communications, and attempted to deceive Rinker and Stroud by falsely telling them that it was C.H. who first initiated contact on Facebook by sending him a friend request. (Doc. 38-1 at 220:7–221:2; Doc. 40-2 at 24:16–22.) The determination that he was dishonest, and therefore not cooperative in the County's sexual harassment investigation, is an independent reason that it is substantially true that Eash violated the sexual harassment policy. (*See* Doc. 38-12 at 5.)

Eash's argument that the statement is false relies on his assertion that his conduct did not meet the strict legal definition of sexual harassment. He argues that after reviewing the full chat, Defendants knew that the sexual conversation was welcome because C.H. did not inform him that she did not want to discuss such an intimate subject; instead, she continued the conversation and even offered her own sexual content to the conversation.[2] However, the question of whether conduct is "unwelcome" is a fact-intensive question determined by the totality of the circumstances. *See* 29 C.F.R. § 1604.11(b). C.H.'s participation in some aspects of the conversation does not diminish the fact that he repeatedly asked for photos of a subordinate who did not want to send them, persisted despite ignored requests to meet up, reminded her of his supervisor status in one breath while asking about her sexual preferences in the next, and was approximately thirty-five years her senior, or that C.H. was a new employee still in training at the 911 Center and expressed unease with his messages to a co-worker and to human resources. Because the court finds as a matter of law that the letter is substantially true, Eash cannot meet the stigma requirement for a deprivation of liberty claim based on reputational damage.

---

[2] When Eash asked "You like wild?", CH replied, "Rough is the only way to do it. 😝 Whips, chains, bondage. Sooooo much better than traditional . . . I like being choked." (Doc. 38-3 at 22–23.) She also assured him that she is not "easily offended," "a snowflake," or "a little bitch." (*Id.* at 47–48.)

Moreover, even if Eash could establish that he was deprived of his liberty interest, his claim would still fail because he has not identified any policy or custom that was the moving force for his injury, and because he does not set forth any evidence to support that the injury was caused by deliberate conduct of an agent of the County with ultimate policymaking authority on the matter. *See Monell*, 436 U.S. at 690–91; *Tuttle*, 471 U.S. at 823–24. Nothing in the record suggests that the County had a pattern of similar reputational violations as to establish a custom. Nor is there any evidence suggesting that the County had a formal or informal policy of communicating false and defamatory reasons for terminating employees.[3] Given the absence of such evidence, Eash cannot show that that the County caused his reputation harm in connection with his termination.

Eash's arguments to the contrary are inapposite. He argues that the County is responsible for incorrectly terminating him based on a violation of the sexual harassment policy because it inadequately trained its human resources personnel in evaluating sexual harassment, waived its anti-fraternization policies in favor of female supervisors, and failed to effectively address the 911 Center's culture which was notorious for sexually suggestive language and conduct. (Doc. 41 at 6–7.) However, it is the communication of the termination, rather than the termination

---

[3] There is no evidence that Rinker possessed or had been delegated ultimate policymaking authority for the County regarding such communications.

alone, that is the source of Eash's alleged liberty deprivation. The record does not support that the County, through its policy or custom, caused Eash's reputational damage, and Eash fails to meaningfully argue otherwise. For these reasons, the court will grant summary judgment to the County on Eash's claim for deprivation of liberty.

### 2. Fourth Amendment Search and Seizure

Defendants also request summary judgment on Eash's claim that Rinker, Stroud, and the County violated his constitutional right to be free from unreasonable search and seizure.[4] Under the Fourth Amendment, a search occurs when "the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 31–33 (2001). A warrantless search is presumptively unreasonable. *United States v. Jacobsen,* 466 U.S. 109, 114 (1984). Nevertheless, several exceptions exist, and the Supreme Court has held that "the special needs of the workplace justify one such exception." *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 760–61 (2010) (internal quotation marks and citation omitted). Under this exception, where a reasonable expectation of privacy exists, a public employer's search must in turn be reasonable. *See Gwynn v. City of Phila.*, 719 F.3d 295, 302–03 (3d Cir. 2013). The Supreme Court has held in a plurality opinion that

---

[4] Although the Second Amended Complaint lodges this claim against all Defendants, the court previously dismissed with prejudice the Fourth Amendment claim against Bixler. (See Doc. 16.)

a non-criminal investigative search by a public employer is reasonable if there are reasonable grounds for suspecting that the search, at its inception, "will turn up evidence that the employee is guilty of work-related misconduct," and "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the nature of the misconduct." *O'Connor v. Ortega*, 480 U.S. 709, 726 (1987); *see City of Ontario*, *Cal.*, 560 U.S. at 761. "Public employers have an interest in ensuring that their agencies operate in an effective and efficient manner, and the work of these agencies inevitably suffers from the inefficiency, incompetence, mismanagement, or other work-related misfeasance of its employees," the consequences of which can be severe for the agency and the general public. *O'Connor*, 480 U.S. at 724.

Here, while there is no dispute that Eash had a privacy interest in his personal cell phone and Facebook Messenger chat with C.H., the record shows that the non-criminal investigatory search was reasonable under the circumstances. At the search's inception, Rinker and Stroud had reasonable grounds to believe that searching through the conversation would reveal violations of the County policies, particularly given the explicit references to sexual content in C.H.'s written complaint, as well C.H.'s disclosure of screenshots showing unsolicited, partially-clothed photographs of Eash, as well as messages sent by Eash that were of a sexual

nature.[5] (Docs. 38-5, 38-6; *see* Doc. 38-6 ("I did not ask for these pictures.").) C.H.'s complaint states that Eash initiated a conversation with her on social media that escalated to him discussing his "sexual preferences and what he enjoyed doing to his girlfriend"; that C.H. "laughed it off but it made [her] extremely uncomfortable"; and that she "didn't want to cause a big issue out of this because he told [her] that he was going to be a supervisor so [she] wasn't [supposed] to say anything." (*Id.*). This information was known to Rinker and Stroud at the time of the search and undoubtedly provided reasonable grounds to suspect that a review of the conversation would uncover evidence that Eash violated the County's sexual harassment policy.

Additionally, the measures Rinker and Stroud employed were "reasonably related to the objectives of the search and were not excessively intrusive in light of the nature of the misconduct." Rinker and Stroud asked C.H. for his phone, and Eash

---

[5] The chat excerpt reads as follows.

> CH: OMG!!! 
> Doug: What?
> CH: That's fucking awesome. LOL.
> Doug: 
> We're active members of a local group.
> CH: What group?
> I thought that you were Lutheran. LOL.
> Doug: Just remember I'll eventually be your Supervisor.
> Nothing can be shared.

(Doc. 38-6 at 6.)

showed Rinker and Stroud only the content of his conversation with C.H. (Doc. 38-1 at 69:8–20, 183:12–20; Doc. 38-3.) Rinker and Stroud did not view any content or communication other than the specific messages and photographs about which C.H. complained, information in which they had a substantial interest in reviewing in order to determine whether Eash violated County policy. (Doc. 38 ¶ 74; Doc. 40 ¶ 74.) *See* 29 C.F.R. § 1604.11(d) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action."); *Faragher v. City of Boca Raton*, 524 U.S. 775, 799 (1998). Given that the 911 Center is tasked with efficient and orderly response to incoming reports of public emergencies, the County has an especially critical interest in rooting out sexual harassment. *See O'Connor*, 480 U.S. at 724. Because Rinker and Stroud had sufficient justification to initiate the search, and because they limited the scope of their search to only that information which was needed to determine whether a violation of County policy occurred, their actions could not have violated the Fourth Amendment.[6]

---

[6] Having decided there is no constitutional violation, the court need not analyze the Individual Defendants' assertion of qualified immunity or whether a policy or custom exists to hold the County liable under *Monell*. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Berg*, 219 F.3d at 276.

Eash's argument that Rinker and Stroud did not have reasonable grounds to initiate the search lacks merit. He argues that they had enough information to establish that the sexually explicit conversation was welcome and consensual. (Doc. 41 at 8; Doc. 40 ¶¶ 54–55.) He points to the enthusiastic tone of C.H.'s messages in the excerpt and her equivocating texts to her coworker.[7] Although Stroud and Rinker had mixed evidence about C.H.'s perception of the chat at the time of the search, that did not dissipate their obligation to investigate her complaint to determine whether the sexual comments were "unwelcome" given the totality of the circumstances. (*See supra* Section III.A.1.) *See also* 29 CFR § 1604.11(b); *Meritor Sav. Bank, FSB*, 477 U.S. at 69. The allegations in C.H.'s complaint, as supported by the chat excerpt and photographs, gave Rinker and Stroud reasonable grounds to suspect that they would find evidence of sexual harassment in the chat.

Similarly lacking in merit is Eash's assertion that he provided the information under duress because he was afraid that he would lose his job if he left the room without providing them the information they demanded. (Doc. 41 at 8; Doc. 40 ¶ 49 n.6, ¶ 59.) Eash testified that he was not physically restrained from leaving the room and that he was never actually told he would be terminated if he left, and the Fourth

---

[7] C.H. asked Erica "if Doug ever came across to you in a weird way" and for her recommendation how to handle the situation. (Doc. 38-4 at 2). She said he found her on Facebook and "started messaging me out of nowhere. Now he wants me to send him pictures. LOL." (*Id.*) She also said, "I'm just paranoid . . . He's actually really cool, and I look to him like a father figure now. He's giving me pointers on the position." (*Id.*)

Amendment is not implicated by every command given to an employee by a government employer. (Doc. 38-1 at 196:8–197:15, 204:24–205:13.) "An officer is not seized 'simply because he believes that he [would] lose his job' or suffer other work-related consequences if he were to leave the police station or fail to report to a designated area." *Gwynn*, 719 F.3d at 300 (internal quotation omitted); *O'Connor*, 480 U.S. 709, 722 (1987) (acknowledging "the common-sense realization that government offices could not function if every employment decision became a constitutional matter") (internal quotation omitted). It follows that a Fourth Amendment violation does not result from a public employer conditioning continued employment on cooperation with a sexual harassment investigation, which is further authorized in the County's policy. (Doc. 38-12 at 5.) Considering all evidence and making all reasonable inferences in Eash's favor, Defendants are therefore entitled to summary judgment on the Fourth Amendment claim.

### B. Defendants are entitled to summary judgment on the intrusion upon seclusion claim.

Defendants additionally request summary judgment on Eash's claim that Rinker and Stroud invaded his privacy.[8] To state a claim for intrusion upon seclusion under Pennsylvania law, "plaintiffs must allege conduct demonstrating 'an

---

[8] The court previously dismissed a claim on this ground against Bixler, as pleaded in the Amended Complaint (Doc. 6), because Eash did not allege any conduct by Bixler that intruded on his privacy. (Doc. 15 at 20.) The Second Amended Complaint appears to suffer from the same deficiency. The court will grant summary judgment on this claim against Bixler because the record does not support, nor does Eash's brief argue, that Bixler's conduct violated his privacy.

intentional intrusion upon the seclusion of their private concerns which was substantial and highly offensive to a reasonable person, and aver sufficient facts to establish that the information disclosed would have caused mental suffering, shame or humiliation to a person of ordinary sensibilities.'" *Boring v. Google Inc.*, 362 F. App'x 273, 278–79 (3d Cir. 2010) (quoting *Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.*, 809 A.2d 243, 247 (Pa. 2002)). The Third Circuit has concluded "that an actor commits an intentional intrusion only if he believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act" and emphasized that both the action and the intrusion must be intentional. *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 404 (E.D. Pa. 2011) (quoting *O'Donnell v. U.S.*, 891 F.2d 1079, 1083 (3d Cir. 1989)).

Here, there is no evidence that Rinker or Stroud believed, or were substantially certain, that they did not have legal permission to view Eash's chat. They were legally justified in conditioning his continued employment on his disclosure (*see supra* Section III.A.2), and the record does not support that they harbored any belief that their actions were illegal. Stroud testified that the County was obligated to investigate C.H.'s sexual harassment complaint and that the search was conducted for that purpose only. (Doc. 40-3 at 41:8–25, 42:8–15.) Rinker testified to her belief that Eash violated the County's sexual harassment policy, that they were justified in

their investigation, and that their decision comported with state and federal law regarding sexual harassment. (Doc. 40-2 at 52:2–13.)

The court is not compelled to infer that Rinker and Stroud knew the intrusion was illegal because, as Eash argues, they should have known the chat was consensual. (Doc. 41 at 9.) As discussed more fully above, the limited evidence of C.H.'s engagement with Eash's messages, as known to Rinker and Stroud at the time, did not conclusively show that the messages were consensual, particularly in the context of her complaint to human resources. Because the search that forms the basis of Eash's Fourth Amendment claim was reasonable at its inception, based on the facts known to Rinker and Stroud at the time, and limited in scope to the Facebook Messenger thread between Eash and C.H., Rinker and Stroud had legal justification for the search, and absent any evidence of their belief to the contrary, the inference that they knew their actions were illegal is unreasonable. Thus, there is no triable issue of fact that Defendants had the intent required for an intrusion on seclusion claim, and Defendants are entitled to summary judgment on this claim.

### C. Defendants are entitled to summary judgment on Eash's defamation claim.

Defendants' motion also requests summary judgment on Eash's claim that Defendants defamed him by publishing his termination letter and the contents of his

messages to people inside and outside of the 911 Center.[9] "To state a claim for defamation, a plaintiff must show: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion." *Byars v. Sch. Dist. of Phila.*, 942 F. Supp. 2d 552, 563 (E.D. Pa. 2013) (citing 42 PA. C.S. § 8343(a)).

Defendants argue that they are not liable for defamation because the statements in the letter are substantially true.[10] Pennsylvania law provides that truth is an absolute and complete defense to a defamation claim. *Pacitti v. Durr,* 310 F. App'x 526, 528 (3d Cir. 2009) (citing *Bobb v. Kraybill,* 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986)). The burden is on the defendant to prove the truth of the

---

[9] The court previously dismissed the defamation claim against Stroud, as pleaded in the Amended Complaint (Doc. 6), because Eash did not allege that Stroud wrote or disseminated the termination letter. (Doc. 15 at 3 n.1.) In the same memorandum, the court determined the County was immunized from defamation liability by Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"). The Second Amended Complaint also appears to suffer from these two deficiencies. (*See generally* Doc. 28.) The court will grant summary judgment on this claim as against Stroud and the County because the record does not support, nor does Eash's brief argue, that Stroud's conduct defamed him or that the PSTCA does not immunize the County.

[10] Defendants additionally contend that they did not publish the termination letter, but their argument is unavailing. Where defamatory matter is intentionally or negligently communicated to a person other than the one defamed, the communication is published. *Chicarella*, 494 A.2d at 1112 (citing Restatement (Second) of Torts § 577 (1977)). It is clear from the letter's carbon-copy designation that it was intentionally communicated to someone other than Eash. (Doc. 38-9.) Even this limited distribution, regardless of whether it was for a proper purpose, constitutes publication.

defamatory communication. 42 PA. CON. STAT. § 8343(b)(1). The defendant can meet this burden if she proves the statements to be substantially true. *Tucker v. Merck & Co., Inc.,* 102 F. App'x 247, 253 (3d Cir. 2004) (citing *Chicarella v. Passant,* 494 A.2d 1109, 1115 n.5 (Pa. Super. Ct. 1985)). "Pennsylvania has determined proof of substantial truth must go to the 'gist' or 'sting' of the alleged defamatory matter." *Keeshan v. The Home Depot, U.S.A., Inc.,* Civ. No. 1:00-CV-529, 2001 WL 310601, *15 (E.D. Pa. Mar. 27, 2001) (internal citation omitted). "The test is whether the [alleged] libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Dunlap v. Phila. Newspapers, Inc.,* 448 A.2d 6, 15 (Pa. Super. Ct. 1982) (internal quotations omitted).

The court already found that the letter's statement that Eash violated the sexual harassment policy is substantially true, not only based on his sexually harassing behavior but also for being uncooperative in the investigation. (*Supra* Section III.A.1.) A jury could not reasonably find that a true statement describing Eash's behavior, as he concedes it to be, would have been any less damaging to his reputation than the letter's statement that he violated the County's sexual harassment policy, which does not by itself implicate him in sexual harassment. Therefore, Defendants are entitled to summary judgment based on their truth defense.

### D. Defendants are entitled to summary judgment on Eash's wrongful discharge claim.

The Individual Defendants also request summary judgment on Eash's claim that they wrongfully terminated him. "In Pennsylvania, an employer may terminate an employee without cause provided that 'the dictates of public policy,' contract, or a statutory provision do not prohibit such termination." *Gillispie v. Regional Care Hosp. Partners Inc.*, 892 F.3d 585, 597 (3d Cir. 2018) (quoting *Spierling v. First Am. Home Health Servs., Inc.*, 737 A.2d 1250, 1253 (Pa. 1999)). A narrow exception exists "only in the most limited of circumstances where the termination implicates a clear mandate of public policy in this Commonwealth." *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 287 (Pa. 2000). "[T]he employee must point to a clear public policy articulated in the constitution, in legislation, an administrative regulation, or a judicial decision." *Hunger v. Grand Central Sanitation*, 670 A.2d 173, 175 (Pa. Super. Ct. 1996). "Pennsylvania courts have construed the public policy exception to at-will employment narrowly, lest the exception swallow the general rule." *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 111 (3d Cir. 2003), *as amended* (Jan. 20, 2004) (citation omitted). "First, we must discern whether any public policy is threatened [by the discharge of an at-will employee]; second, even when an important public policy is involved, an employer may discharge an employee if he has separate, plausible and legitimate reasons for doing so. *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 616 (3d Cir. 1992), *as*

*amended* (May 29, 1992) (quoting *Cisco v. United Parcel Services, Inc.*, 476 A.2d 1340, 1343 (Pa. Super. Ct. 1984)).

Eash appears to assert that his termination violates several public policy interests, including the Fourth Amendment, privacy and search and seizure protections under the Pennsylvania Constitution, and intrusion on seclusion under Pennsylvania common law.[11] (*See* Doc. 28 at ¶¶ 115, 116, 120.) Because the court has already determined that Eash's Fourth Amendment and intrusion on seclusion claims fail as a matter of law, the only remaining public policy grounds are based on the Pennsylvania Constitution. And while it is true that the Commonwealth's constitution affords greater privacy and search and seizure protections than its federal counterpart, Eash's brief does not argue or cite any authority to support that the special needs exception did not justify Defendants' review of his chat under the Pennsylvania Constitution, and extending Pennsylvania's narrow public policy exception to the circumstances would be to punish an employer for nothing more taking reasonable efforts to comply with their obligations under federal law. *See Com. v. Duncan*, 817 A.2d 455, 459 (Pa. 2003); (Doc. 41 at 12); *see McDaniel v. Am. Red Cross, Johnstown Region*, 58 F. Supp. 2d 628, 634 (W.D. Pa. 1999) ("Courts should be reluctant to find state public policy interests that 'jostle

---

[11] The Third Circuit and Pennsylvania courts left open the possibility that a tortious invasion of privacy could support a wrongful discharge claim. *See Borse*, 963 F.2d at 622; *Geary*, 319 A.2d at 180.

uncomfortably' with those of federal antidiscrimination law, lest in the process they subvert the latter and subject employers to vague, undefined standards under which they can be held liable no matter which course they take.").

Even assuming that terminating Eash for violating the sexual harassment policy implicates a public policy, Defendants were nevertheless justified in terminating Eash based on a separate, plausible, and legitimate reason. The termination letter also states that Eash instigated dissatisfaction among fellow employees in violation of the County's discipline policy, and as discussed more fully above, the record provides ample support for that conclusion. (Doc. 38-9; Doc. 38-11 at 3.) C.H.'s co-worker expressed her concern by reporting the conversation to Stroud, and C.H. filed a written complaint expressing her discomfort with the messages and her concerns about Eash's status as a supervisor. (*See* Doc. 38-9; Doc. 38-4.) This asserted reason is altogether separate from the public policy concerns Plaintiff invokes. In fact, the Supreme Court of Pennsylvania has recognized that an employer has a legitimate interest in "preserving harmony among its employees and in preserving its normal operational procedures from disruption." *Rogers v. Int'l Bus. Machines Corp.*, 500 F. Supp. 867, 869 (W.D. Pa. 1980) (quoting *Geary v. United States Steel Corp.*, 319 A.2d 174, 180 (Pa. 1974)). This rationale is all the more compelling in the context of a public emergency response center. *See O'Connor*, 480 U.S. at 724. Even considering all evidence in the light most favorable to Eash, there

is no triable issue of fact, and Defendants are entitled to summary judgment on the wrongful discharge claim as a matter of law.

### E. Defendants are entitled to summary judgment on the PHRA gender-based discrimination claim.

Finally, Defendants request summary judgment on Eash's claim for gender-based discrimination in his termination.[12] (*See* Doc. 28 ¶¶ 125–131; Doc. 38-15 ¶¶ 35–46.)

### 1. Eash failed to administratively exhaust his claim against the Individual Defendants.

In their brief, Defendants argue that Eash failed to administratively exhaust his PHRA claim against the Individual Defendants because only the County was a named respondent in his administrative complaint. (*See* Doc. 39 at 39 n.14.) Eash does not refute this point, except to clarify that Rinker and Stroud were named in the body of his amended administrative complaint. (*See* Doc. 41 at 12; Doc. 38-15.) "Before filing suit under the PHRA, a plaintiff must first exhaust all administrative remedies by filing a charge of discrimination (also referred to as an administrative complaint) with the Pennsylvania Human Relations Commission ("PHRC") or EEOC." *Hills v. Borough of Colwyn*, 978 F. Supp. 2d 469, 479 (E.D. Pa. 2013)

---

[12] The court is not persuaded, as Defendants urge, to restrict Eash's gender-based discrimination claim to his denial of promotions based on a small, unrepresentative excerpt from Eash's deposition testimony. (*See* Doc. 38 ¶ 123; Doc. 39 at 40.) The Second Amended Complaint and the administrative complaint make clear that his termination is the basis of his gender-based discrimination claim, and Eash testified that he believed gender played a role in his termination. (Doc. 28; Doc. 38-15; Doc. 38-1 at 208:6–16.)

(internal citation omitted); 43 PA. STAT. ANN. § 962). Otherwise, the "named respondent" rule generally bars a plaintiff who does not name a defendant in his administrative charge from bringing a lawsuit against that defendant in court. *See Hills*, 978 F. Supp. 2d at 479 (citing *Schafer v. Bd. of Pub. Educ.*, 903 F.2d 243, 251 (3d Cir. 1990)). The purpose of the administrative exhaustion requirement is "to give notice to the charged party and provide an avenue for voluntary compliance without resort to litigation." *Glus v. G. C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977); *Webb v. City of Phila.,* 562 F.3d 256, 262 (3d Cir. 2009).

The Third Circuit has articulated an exception that permits a claim to proceed against an individual not named in the administrative complaint "when the unnamed party received notice and when there is a shared commonality of interest with the named party."[13] *Hills*, 978 F. Supp. 2d at 479 (citing *Schafer*, 903 F.2d at 252); *see also Jankowski v. Fanelli Bros. Trucking Co.*, No. 3:13-CV-2593, 2014 WL

---

[13] The *Schafer* test distills the Third Circuit's earlier formulation of the exception, which instructs courts to consider:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; [and] 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Glus*, 562 F.2d at 888.

1612600, at *6 (M.D. Pa. Apr. 22, 2014) (citing *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir. 1996) and applying the exception to PHRA claims). Courts have found notice sufficient when the plaintiff mentions the defendant in the body of the complaint instead of naming the defendant as a respondent. *See DuPont v. Slippery Rock Univ. of Pa.*, No. 2:11-CV-1435, 2012 WL 94548 (W.D. Pa. Jan. 11, 2012) (citation omitted). Although the requirements for administrative exhaustion "are to be interpreted in a nontechnical fashion, the aggrieved party is not permitted to bypass the administrative process." *Jankowski*, 2014 WL 1612600, at *5 (indirectly quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir. 1976)).

Absent any evidence that the Individual Defendants had actual notice of the PHRC complaint, the court is constrained by the four corners of the amended administrative complaint which states in relevant part that Stroud and Rinker discharged Eash but does not mention Bixler or reference her position. (*See* Doc. 38-15 ¶ 37.) By this measure, Rinker and Stroud had notice, but Bixler did not. Bixler's lack of notice is sufficient basis to grant summary judgment in her favor on this claim.

In determining whether an unnamed defendant has a sufficient commonality of interests with a named respondent, specifically in the context of a named employer and its unnamed employee, district courts in this circuit have come to different conclusions. *See Meyers v. California Univ. of Pennsylvania,* No. 2:12–CV–1258,

2013 WL 795059, *13 (W.D. Pa. Mar. 4, 2013) (finding that "[t]he interests in obtaining voluntary conciliation of CalU (a public university part of the PaSSHE) and Harrison (an individual) are not so similar that it was unnecessary to specifically include Harrison in the administrative process"); *but see Lowenstein v. Catholic Health East,* 820 F. Supp. 2d 639, 646 (E.D. Pa. 2011) ("Since [the named employer] can be held liable for its employees' discriminatory conduct, [the named employer] and [unnamed employee] shared a common interest in defending against plaintiff's allegations."). Because the opportunity for conciliation is a vital purpose of the administrative exhaustion requirement, the court is persuaded that the interests of employees sued in their individual capacity are not so indistinguishable from their employer's interests as to justify depriving them of an out-of-court conciliation opportunity. *See Glus*, 562 F.2d at 888 (finding the council members' interests, as individuals, were not sufficiently similar to those of the Borough "that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include [them] in the [administrative] proceedings"); *cf. Hills*, 978 F. Supp. 2d at 479–80 (distinguishing individual capacity and official capacity suits for the purpose of notice based on the different assets subject to liability in each). Because the record is silent as to whether the Individual Defendants were invited to or actually participated in conciliation, and since Eash does not advance any other argument concerning the alignment of their individual interests with the County's, the court

finds that the Individual Defendants do not have sufficient commonality of interests with the County to excuse Eash's failure to name them as respondents. The record thus does not support excusing Eash from the exhaustion requirements under the *Schafer* exception, and the Individual Defendants are entitled to summary judgment on Eash's gender discrimination claim.[14]

### 2. The County is entitled to summary judgment based on the merits.

In gender-based discrimination claims, the *McDonnell-Douglas* burden-shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1974); *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016). The framework has three steps. First, the plaintiff must establish a prima facie case of discrimination by showing that "(1) [he] is a member of a protected class; (2) [he] was qualified for the position in question; (3) [he] suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Tourtellotte*, 636 F. App'x at 842 (citing *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir. 1999)). A plaintiff can establish such an inference

---

[14] Applying the *Glus* factors, the test from which the *Schafer* test was derived, the court would arrive at the same conclusion. *See Hills*, 978 F. Supp. 2d at 482 (applying both tests). First, Eash knew the names and alleged conduct of the Individual Defendants because he had already filed the instant lawsuit naming them and alleging their conduct by the time he filed the amended PHRC complaint. Second, the County and the Individual Defendants lack a sufficient commonality of interests, as analyzed above. Third, there is no evidence that Individual Defendants were given the opportunity resolve the claim outside of court. Fourth and finally, there is no evidence that the Individual Defendants informed Eash that they should be contacted through the County. Therefore, analysis under *Glus* further supports the grant of summary judgment to the Individual Defendants.

by demonstrating that "similarly situated non-members of the protected class were treated more favorably." *Langley v. Merck & Co.*, 186 F. App'x 258, 259 (3d Cir. 2006). Second, if the plaintiff successfully makes a prima facie case, "the burden then shifts to the employer to articulate a legitimate . . . nondiscriminatory reason for its actions." *Tourtellotte*, 636 F. App'x at 842. Third, if the employer articulates a legitimate reason for its actions, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the asserted nondiscriminatory explanation is "merely a pretext for the discrimination." *Id.* Although the burden of production shifts, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Jones*, 198 F.3d at 410.

Here, Defendants do not contest the prima facie elements of Eash's gender discrimination claim, but rather assert that Eash does not create a triable issue of fact concerning pretext in order to rebut their proffered legitimate, nondiscriminatory reasons for terminating him. (Doc. 39 at 41–42.) To establish pretext, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (citation omitted). Demonstrating that the employer's

decision was merely "wrong or mistaken" is insufficient, and the plaintiff must instead identify "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the employer's asserted reasons that a reasonable factfinder could find them "unworthy of credence." *See Tomasso*, 445 F.3d at 708 (quoting *Fuentes*, 32 F.3d at 765); *see also Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (requiring the plaintiff to "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision").

Eash does not expressly argue that Defendants' asserted reasons are pretext.[15] However, based on the record and his response to Defendants' statement of facts, the court discerns his argument to be that the County wrongly determined that he violated the sexual harassment policy because the conversation was private, consensual, and not harassing. (*See* Doc. 38 at ¶¶ 100–03; Doc. 40 at ¶¶ 100–03.) However, even if the County was incorrect in finding that Eash violated its sexual harassment policy, that alone cannot alone support that the County's asserted reason was pretext. *See Tomasso*, 445 F.3d at 708. Eash does not contradict the core facts that the County relied on in finding that he violated the sexual harassment policy,

---

[15] Eash's argument that the continuing violations doctrine should apply are inapposite to his claim of gender-based discrimination in his termination. *See Griffin v. State of New Jersey Dep't of Hum. Servs.*, No. 19-2751, 2021 WL 3780078, *2 (3d Cir. Aug. 26, 2021) (holding that the doctrine does not apply to discrete acts of discrimination such as termination). Furthermore, with the exception of Eash's limited deposition testimony concerning the County declining to promote him on two occasions in favor of women he describes as having less tenure and qualifications, the record on this point has not been developed and holds little evidentiary value of discriminatory intent. (*See* Doc. 38 ¶¶ 5–11; Doc. 40.)

and there is no basis in the record for doubting that Defendants held an honest belief that Eash did in fact violate the sexual harassment policy.

Both C.H. and C.H.'s coworker complained to human resources, and their complaints were substantiated with evidence of harassment. Stroud and Rinker interviewed both parties, reviewed the photos and messages sent by Eash, and reasonably concluded that Eash violated their sexual harassment policy. (*Supra* Section III.A.1.) In securing Bixler's approval and communicating the termination, they summarized their investigation and the grounds for the infractions. Eash has not identified any inconsistencies in the County's explanation for his termination, and a reasonable jury could not find the County's asserted reasons "unworthy of credence." *Tomasso*, 445 F.3d at 708; *see Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000).

Nor could a jury reasonably find pretext based on Eash's assertion that the County did not enforce its sexual harassment policies uniformly between male and female employees. (*See* Doc. 41 at 4; Doc. 40 at ¶¶ 91; *see also* Doc. 38-12) (stating that the County will accept oral or written complaints from an employee who observes or is the target of sexually harassing behavior, acknowledge and investigate the complaint, communicate a timely resolution of the investigation, and sanction violations, up to and including termination depending on the nature and severity of the infraction.) The Individual Defendants attest that there is no County record of

similar allegations or complaints. (Doc. 39 ¶ 102–03; Doc. 40 ¶ 102–03.) Eash has not identified any similarly situated women against whom a sexual harassment complaint was lodged and whom the County failed to investigate, and he testified that was unaware of any other supervisor who had a sexual harassment complaint filed against them. (*See* Doc. 38-2 at 28:15–20; Doc. 38 ¶ 101; Doc. 40 ¶ 101.) For comparison, Eash relies on the existence of an intimate relationships between Stroud, who is a supervisor, and a subordinate 911 dispatcher, but that relationship was disclosed to human resources personnel to minimize any perceived conflicts of interest, and there is no indication that the relationship was not consensual, or that it otherwise spurred in a sexual harassment complaint. (*See* Doc. 41 at 3–4; Doc. 40-2 at 75:21–78:13.) For similar reasons, Eash's argument that the 911 Center normalized sexual banter in the workplace and fraternization between supervisors and subordinates is no more persuasive. (*See* Doc. 40-7; Doc. 40 ¶ 91.) The circumstances argued by Eash vary substantially from those surrounding his termination and therefore cannot support a finding that the County's asserted nondiscriminatory reasons were pretext. *See Tourtellotte*, 636 F. App'x at 854 (finding no pretext where the individuals plaintiff identified did not engage in substantially similar behavior). Accordingly, summary judgment will be granted on Eash's gender-based discrimination claim.

IV.   **CONCLUSION**

For the reasons explained above, the court will grant the motion for summary judgment filed by Defendant County of York, Pennsylvania and Individual Defendants Kristy Bixler, Kimberly Rinker, and Ashli Stroud. An appropriate order shall follow.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: March 30, 2022